**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KIMBERLY KAY DAVISSON, | ) | |
| | ) | CASE NO.    1:10-cv-02411 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Kimberly Kay Davisson ("Davisson") challenges the final decision of the

Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Davisson's

claim for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II

of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423 *et seq*.  This matter is before the

Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of

28 U.S.C. § 636(c)(2).

For the reasons set forth below, this Court VACATES and REMANDS the final decision

of the Commissioner for further proceedings consistent with this opinion.

**I.  Procedural History**

On June 30, 2008, Davisson filed an application for POD and DIB alleging a disability

onset date of June 15, 2007, and claiming that she was disabled due to various impairments.  Her application was denied both initially and upon reconsideration.  Davisson timely requested an administrative hearing.

On January 21, 2010, an Administrative Law Judge ("ALJ") held a hearing during which Davisson, represented by counsel, testified.  Barbara K. Byers, a vocational expert ("VE") also testified.  On February 1, 2010, the ALJ found Davisson was capable of performing past relevant work and, therefore, was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II.  Evidence

### Personal and Vocational Evidence

Age 48 at the time of her administrative hearing, Davisson is a "younger" person under social security regulations.  *See* 20 C.F.R. § 404.1563(c).  Davisson attended two years of college and had past relevant work as a tax preparer, bookkeeper, and accountant.

### Medical Evidence

Davisson has been treated by Steven A. Cremer, M.D., for fibromyalgia since 2003.  (Tr. 17).  On February 9, 2006, Davisson complained of increased "pain and spasm," specifically in her neck and shoulder.  (Tr. 453.)  Dr. Cremer found that Davisson had "significantly notable trigger points in trapezii bilaterally."  *Id*.  Otherwise, her exam was unchanged from previous visits.  *Id*.  Dr. Cremer noted that Davisson was "doing well" with her narcotic pain-relieving, muscle relaxant, and anti-inflammatory medications.  *Id*.  He administered trigger point injections bilaterally in the trapezii.  *Id*.  He further noted that Davisson's stress levels were high, and prescribed medication for anxiety.  *Id*.

2

On May 11, 2006, Davisson reported to Dr. Cremer that she had a new complaint of pain in both knees after she began walking in an attempt to lose weight. (Tr. 450.) She reported that she was feeling much better on her new anxiety medication. *Id.* Dr. Cremer diagnosed myofascial pain syndrome, depression and anxiety, and chondromalacia of the patella with possible underlying internal derangement. *Id.*

On May 21, 2007, Davisson underwent an MRI of her right knee, which revealed a small right knee joint effusion and prepatellar bursitis. (Tr. 458.) There was no evidence of a fracture, subluxation, or tendon, ligament, or meniscal tears. *Id.*

After undergoing a hysterectomy on June 18, 2007, Davisson was hospitalized for an ensuing infection. (Tr. 263-65.) On August 9, 2007, C.J. Manohar, M.D., saw Davisson after she was discharged from the hospital. (Tr. 368.) He diagnosed Davisson with bilateral deep vein thrombosis ("DVT"), healing abdominal wall infection, depression, and pain. *Id.* He prescribed antidepressants and a pain reliever. *Id.* On August 29, 2007, Dr. Manohar noted that Davisson's wound had healed well and there was no sign of infection. (Tr. 367.)

On September 6, 2007, Davisson again saw Dr. Manohar. (Tr. 366.) She complained of a bruise on her right buttock area that was painful and increasing in size. *Id.* Dr. Manohar determined that she had a hematoma and noted severe abdominal pain from the healing wound, bilateral DVT, and depression. *Id.* No significant changes were noted at a subsequent visit on September 24, 2007. (Tr. 365.)

On October 4, 2007, Dr. Cremer saw Davisson for the first time since May of 2007. (Tr. 436.) He noted that Davisson continued to have fibromyalgia problems. *Id.*

On October 22, 2007, Dr. Manohar saw Davisson for a follow-up appointment. (Tr.

3

362.) He noted her wound had healed, but re-opened.  *Id.*  He also noted that an attempt to work had failed and she was back on medical leave.  *Id.*

In November of 2007, Davisson saw Haig Tcheurekdjian, M.D., for an allergy/immunology consultation.  (Tr. 317-18.)  Dr. Tcheurekdjian noted that since her discharge from the hospital, Davisson had a slow recovery, but no recurrent infections. (Tr. 317.) He diagnosed immune deficiency and dyspnea.  (Tr. 316.)  He ordered additional laboratory studies.  (Tr. 317.)  On December 13, 2007, Dr. Tcheurekdjian diagnosed Davisson with antibody response deficiency and advised her to have monthly immunoglobulin infusions.  (Tr. 304.)  Davisson received the infusions from January to April 2008.  (Tr. 290-91, 287-88, 284–85, 278-79, 276-77.)

Also on December 13, 2007, Dr. Cremer noted that Davisson continued to have "persistent immune problems" after her hysterectomy, but that her fibromyalgia was stable.  (Tr. 433.)  He expressed reluctance to change her medications until her other medical issues were resolved.  *Id.*  He also noted that Davisson was compliant with treatment.  *Id.*

On December 31, 2007, Dr. Manohar noted that Davisson had continued abdominal pain, but noted no other significant changes.  (Tr. 361.)  On February 6, 2008, Davisson again saw Dr. Manohar, who noted that Davisson had been diagnosed with combined variable immune deficiency and required immunoglobulin shots once a month.  (Tr. 359.)  He wanted an ultrasound performed to see how the DVT blood clot was resolving.  *Id.*  On February 8, 2008, an ultrasonography was taken of Davisson's upper extremities, which revealed DVT on the right involving the internal jugular and subclavian veins with partially occluding thrombus.  (Tr. 378.)

On February 28, 2008, Dr. Cremer noted that Davisson had been diagnosed with a

common variable immune deficiency ("CVID").  (Tr. 430.)  He determined that she could no longer receive standard trigger point injections because of her immune status, but he renewed her other medications.  *Id*.

On March 25, 2008, Davisson saw Dr. Manohar and complained of continued abdominal pain and mild swelling of the right leg.  (Tr. 358.)  Her diagnoses and medications were not changed.  *Id.*

On April 24, 2008, Dr. Cremer noted Davisson's immune disorder significantly complicated her fibromyalgia treatment.  (Tr. 427.)  He again found multiple trigger points.  *Id.* Though the combination of medications had been "quite helpful," Davisson stopped taking Lyrica due to weight gain.  *Id*.

In May 2008, Davisson saw Vincent C. Cibella, D.P.M., a podiatrist, for cellulitis of the right foot.  (Tr. 346.)  Treatment notes from later that month indicated that Davisson's ulcers were resolving with treatment, her subtalar and midtarsal joints had normal range of motion, and she ambulated with a cane.  (Tr. 345.)

On May 21, 2008, Davisson saw Dr. Manohar after her hospitalization for cellulitis of the right leg and a foot ulcer.  (Tr. 356.)  He noted she had been treated with Levaquin.  *Id.*  On June 19, 2008, Davisson again saw Dr. Manohar and she complained of fatigue, arthralgias, and chronic abdominal pain.  (Tr. 355.)  Dr. Manohar noted that her abdominal wound was not completely healed and continued her on Levaquin.  *Id.*

In a letter to Dr. Manohar dated June 28, 2008, Dr. Cremer wrote that Davisson "has a long history of fibromyaliga and then developed her immune deficiency and complex problems after her surgeries in the last couple of years."  (Tr. 334.)  He stated that "she has not felt to be

capable of maintaining compensable work" and that he "cannot foresee in the upcoming two years that she would be able to return to that type of function." *Id*.

In a letter to "Whom It May Concern" dated July 9, 2008, Dr. Tcheurekdjian wrote that Davisson's CVID "predisposes her to recurrent, severe, life-threatening infections."  (Tr. 275.) He opined that her immune deficiency together with her other disorders – arthralgia, asthma, and fibromyalgia – "make it nearly impossible for her to work in a productive fashion."  *Id*.

On July 18, 2008, Arminda Lumapas, M.D., after evaluating Davisson for joint pain, diagnosed "fibromyalgia, currently active, 17/18 tender points."  (Tr. 547.)

Also on July 18, 2008, Dr. Cibella, in a letter to the Bureau of Disability Determination, noted he had not seen Davisson since May 29, 2008, as she had failed to attend a follow-up appointment in June.  (Tr. 344.)  Though he indicated that he could not determine whether she could work, he did opine that Davisson's CVID would make it "very difficult for her [to work] due to the fact of interaction with individuals any bacteria may attack her quite readily ..."  *Id*.

On September 10, 2008, Dr. Cremer noted that Davisson's pain levels had been slowly increasing, but she did not request an increase in medication.  (Tr. 425.)

On October 10, 2008, Eulogio Sioson, M.D., performed a consultative examination at the request of the Administration.  (Tr. 464.)  He noted that Davisson had been diagnosed with fibromyalgia seven years earlier.  *Id*.  Davisson measured five feet and four inches tall and weighed 204 pounds.  (Tr. 465.)  It was noted that she walked with a slight limp without an assistive device and that she loses balance when attempting to do heel/toe walking.  *Id*. Throughout the examination, Dr. Sioson recorded pain when Davisson attempted to rise from squatting, perform range of motion tests while lying down, and during manual muscle testing.

6

*Id*.  She could not do straight leg raising due to back pain.  *Id*.  He found she could grasp and manipulate with each hand.  (Tr. 465-66.)  Dr. Sioson diagnosed asthma, history of CVID with recurrent infections, fibromyalgia/arthritis with sixteen positive tender points and unusually severe pains, depression, post-operation reducible abdominal hernia, and obesity.  (Tr. 465.)  It was his impression that except for pain limitation, the neuromusculoskeletal data showed no other objective findings that would affect work-related exertional activities.  *Id.*

On November 6, 2008, Dr. Cremer again diagnosed fibromyalgia with multiple trigger points.  (Tr. 423.)  Davisson continued to experience weight gain, and suffered from depression and an immunologic deficiency of unclear etiology.  *Id*.

On December 23, 2008, Cindi Hill, M.D., a state agency reviewing physician, found Davisson could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and, had unlimited ability to push and/or pull other than as shown for lifting and/or carrying.  (Tr. 514.)  She found Davisson could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders/rope/scaffolds.  (Tr. 515.)  She further found that Davisson had no manipulative, visual, or communicative limitations.  (Tr. 516.)  However, Dr. Hill found Davisson should avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation and avoid all exposure to hazards such as machinery and heights.  (Tr. 517.)  On March 17, 2009, Esberdado Villanueva, M.D., a state agency physician, reviewed the medical evidence of record and affirmed Dr. Hill's opinion.  (Tr. 526.)

On January 6, 2009, Davisson was seen at the Geneva Clinic.  (Tr. 605.)  She was diagnosed with CVID, fibromyalgia, and acute anxiety.  *Id*.  On May 8, 2009, progress notes

from the Geneva Clinic indicate that Davisson had an abdominal hernia "somewhat tender to touch," as well as a small hernia in the suprapubic and right lower abdominal area without any overlying tenderness or erythema.  (Tr. 598.)

On May 14, 2009, Dr. Cremer indicated that Davisson's pain level was stable.  (Tr. 678.) He changed her medication to Savella, which he indicated may be more targeted to fibromyalgia. *Id.*  He diagnosed fibromyalgia and lumbar degenerative disc disease.  *Id.*

On October 22, 2009, Dr. Cremer provided a summary of Davisson's condition and an opinion regarding her functional abilities.  (Tr. 739-49.)  He opined that Davisson would be unable to perform compensable work in the foreseeable future.  (Tr. 740.)  He reported her pain was between five and eight on a ten-point scale and that despite aggressive medications, she experienced only 60% pain relief.  *Id.*  In an Impairment Questionnaire, Dr. Cremer noted that Davisson could only sit for two hours and stand/walk for zero to one hour in an eight-hour day. (Tr. 743.)  He indicated that she would not be able to sit or stand/walk continuously in a work setting.  (Tr. 743-44.)  He noted that she could occasionally lift and carry up to ten pounds but never anything heavier and that Davisson had significant limitations in repetitive reaching, handling, and fingering.  (Tr. 744.)  He felt that Davisson would need three to four unscheduled breaks to rest at unpredictable intervals during the workday and would likely be absent more than three times per month.  (Tr. 746-47.)  He also indicated that Davisson would be unable to stoop, kneel, or work at heights.  (Tr. 747.)  He concluded that the following clinical findings supported the described limitations: limited range of motion in multiple joints, positive testing in fourteen of eighteen tender points in accordance with the American College of Rheumatology, and his observation of open wounds.  (Tr. 741.)

8

In November 2009, Maria Jofre, M.D., a rheumatologist, wrote that Davisson had been admitted to University Hospitals in late July with sepsis and severe cutaneous manifestations following abdominal surgery.  (Tr. 756.)  Davisson was diagnosed with pyoderma gangrenosa likely associated with PAPAS syndrome.  *Id.*  It was recommended that she be treated with oral corticosteroids as well as routine IVIG therapy.  *Id.*  Since treatment began, Dr. Jofre noted that Davisson had responded well and her skin ulcerations had been healing "quite appropriately." (Tr. 756-57.)  However, she was still oozing serous fluid in a very small area.  *Id.*  Davisson ambulated without difficulty and had full range of motion despite diffuse tenderness through her muscles.  (Tr. 757.)

*Hearing Testimony*

At the hearing, Davisson testified to the following:

- She lives with her boyfriend in a mobile home.  (Tr. 29.)

- She attended college for two years, but did not receive a degree.  (Tr. 29.)

- She is 5'6" tall and weighs 200 pounds.  (Tr. 29, 31.)

- She last worked on June 15, 2007.  She stopped working after she underwent a hysterectomy.  She unsuccessfully attempted to resume working a few months later.  (Tr. 29-30.)

- She has used a cane for two years.  (Tr. 31.)

- She is able to do a little bit of housework for fifteen minutes at a time.  (Tr. 31.) She is able to drive and shop for food.  (Tr. 31-32.)  She arranges her grocery list by aisle to minimize walking and requests assistance reaching items.  (Tr. 33.) She has a helper bring the groceries to her car.  *Id.*  She has trouble lifting and getting in and out of the car.  *Id.*  Therefore, she usually tries to schedule her shopping when someone can help her.  *Id.*

- She has difficulty dressing and bathing.  She is prone to falling in the shower and tries to avoid wearing clothing with buttons and zippers, as those cause her difficulties due to pain in her hands and fingers.  (Tr. 32, 34.)

9

- She can stand for about ten minutes.  (Tr. 32.)

- She wears a Fentanyl patch and takes Vicodin for breakthrough pain.  She experiences pain throughout ninety percent of her waking hours in her neck, shoulders, arms, elbows, wrists, hands, low back, tailbone, hips, abdomen, knees, and ankles.  (Tr. 32-33).

- Her hobby is watching television (Tr. 31) and she uses a laptop computer "a little bit at a time" while laying in bed.  (Tr. 33.)

- She spends four to five hours of the day, and sometimes all day, in bed.  (Tr. 35.)

- Dr. Cremer's treatment, specifically the cortisone shots, helped relieve her pain for about six weeks.  (Tr. 36.)  However, she stopped receiving those due to her CVID.  *Id.*

- She did not feel that she could work because she is unable to sit for long periods of time and her medication causes lapse in memory and judgment.  (Tr. 36-37.) She did not believe the ability to sit and stand at will would allow her to work.  *Id.*

The VE testified that Davisson's past relevant work of a tax preparer was sedentary and semiskilled, her past relevant work of a bookkeeper was sedentary and skilled, and her past relevant work of accountant was sedentary and skilled.  (Tr. 38.)  The ALJ posed the following hypothetical to the VE:

> Suppose I were to find that Ms. Davisson, [our] hypothetical individual, would possess a residual functional capacity for sedentary work, full range being diminished by the following.  This individual could lift and carry 10 pounds occasionally.  Could sit for eight hours in an eight-hour day.  Walk or stand six hours in an eight-hour day, but should be allowed an alternating sit/stand option at will.  Only occasional bending or squatting.  No climbing or work at unprotected heights o[r] around dangerous machinery.  No work overhead.  No pushing or pulling of more than 10 pounds occasionally.  And no exposure to excessive amounts of dust or other air pollutants.  Considering Ms. Davisson's age, education and work experience are there jobs she could perform?  And the issue would be whether she could return to any past jobs?

(Tr. 38-39.)

The VE testified that such an individual would be able to perform all of Davisson's past

relevant work as a tax preparer, accountant, and bookkeeper. (Tr. 38-39.) Davisson's counsel

asked whether a person limited to a total of three hours sitting and standing would be able to

work. (Tr. 39.) The VE responded in the negative. *Id*.

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[1]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when

she became disabled; and (3) she filed while she was disabled or within twelve months of the

date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Davisson was insured on her alleged disability onset date, June 15, 2007, and remained

insured through the date of the ALJ's decision, February 2, 2010. (Tr. 13.) Therefore, in order to

be entitled to POD and DIB, Davisson must establish a continuous twelve month period of

---

[1]     The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

disability commencing between June 15, 2007 and February 2, 2010.  Any discontinuity in the

twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991,

994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.  Summary of Commissioner's Decision

The ALJ found Davisson established medically determinable, severe impairments, due to

obesity, fibromyalgia/arthritis, asthma by history, and immune deficiency; however, her

impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R.

Pt. 404, Subpt. P, App. 1.  Davisson was found capable of performing her past work activities,

and was determined to have a Residual Functional Capacity ("RFC") for a limited range of

sedentary work.  The ALJ then used the Medical Vocational Guidelines ("the grid") as

framework, along with VE testimony, to determine that Davisson is not disabled.

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the

record to support the ALJ's findings of fact and whether the correct legal standards were applied.

*See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed

if the administrative law judge's findings and inferences are reasonably drawn from the record or

supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been

defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular

conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than

a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v.

Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI. Analysis

Davisson claims the ALJ erred by: (1) failing to follow the treating physician rule; and (2) failing to properly evaluate Davisson's credibility.

**Treating Physician**

Davisson contends that the ALJ improperly rejected the opinions of her treating

13

physicians Drs. Cremer, Tcheurekdjian, and Cibella. (Doc. No. 12 at 15.) The Commissioner responds that the ALJ expressly discussed each of the opinions and properly explained his reasons for giving them only moderate weight. (Doc. No. 15 at 15.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[2]

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at

---

[2]        Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p). Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(e)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

To begin, the ALJ was not bound to accept the opinions of Davisson's physicians that she is disabled, as it is the Commissioner who makes the determination as to whether the statutory definition of disability has been met. *See* 20 C.F.R. § 404.1527(e)(1). Nonetheless, the ALJ was bound to set forth his reasons for rejecting the limitations contained in their opinions. The ALJ purported to ascribe moderate weight to Dr. Cremer's opinions, however the limitations contained in the RFC and those assigned by Dr. Cremer's opinion are inconsistent. Dr. Cremer's opinion, largely consistent with other treating sources, identified specific functional limitations

15

resulting from the claimant's impairments, including the ability to sit for only two hours and stand/walk for zero to one hour in an eight-hour day, the inability to sit or stand/walk continuously in a work setting, and the ability to only occasionally carry up to ten pounds.  (Tr. 17, 743-44.)  Dr. Cremer further opined that Davisson required three to four unscheduled breaks a day at unpredicted intervals and that she would likely be absent more than three times a month.[3]  (Tr. 17, 746.)  By contrast, the state agency reviewing physician found that Davisson could sit for six hours and stand/walk for six hours in an eight-hour day, and lift up to fifty pounds occasionally.  (Tr. 514.)

The ALJ apparently rejected Dr. Cremer's opinion and adopted the state reviewing physician's opinion, finding that Davisson could perform sedentary work on a sustained basis.  (Tr. 19.)  He found that Davisson could sit, with normal breaks, for eight hours and that she could walk/stand for six hours out of an eight-hour day provided she had a sit/stand option at will.  *Id.*  He did, however, limit Davisson to lifting up to ten pounds occasionally.  *Id.*  The ALJ's statement that he "concurs with the State Agency assessments but has found a more restrictive residual functional capacity to account for limitations described by the claimant's treating providers" (Tr.19) does not offer a sufficient explanation as to why he rejected Dr. Cremer's opinion.

Davisson contends that the three reasons the ALJ implied for rejecting the limitations advised in Dr. Cremer's opinion were in error.  First, the ALJ believed the limitations were based only on Davisson's subjective complaints, and that there was no corroborative objective

---

[3]        The VE testified that a person limited to three hours of sitting and standing – more than the limitation allowed by Dr. Cremer – would not be able to work.  (Tr. 39.)

evidence to verify disability. (Doc. No. 12 at 17.) Davisson contends that this belief was based on the ALJ's fundamental misunderstanding of fibromyalgia. *Id.*

In contrast to most other medical impairments, it is difficult to find corroborative medical evidence in fibromyalgia cases.

> Fibromyalgia, also referred to as fibrositis, is a medical condition marked by "chronic diffuse widespread aching and stiffness of muscles and soft tissues." *Stedman's Medical Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005). We note also that ours is not the only circuit to recognize the medical diagnosis of fibromyalgia as well as the difficulties associated with this diagnosis and the treatment for this condition. *See Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) (noting that fibromyalgia's "causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective"); *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) ("Fibromyalgia, which is pain in the fibrous connective tissue of muscles, tendons, ligaments, and other white connective tissues, can be disabling."); *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2nd Cir. 2003) (noting that "a growing number of courts . . . have recognized that fibromyalgia is a disabling impairment and that there are no objective tests which can conclusively confirm the disease") (internal quotation marks and citations omitted); *Welch v. Unum Life Ins. Co. of Am.*, 382 F.3d 1078, 1087 (10th Cir. 2004) ("'Because proving the disease is difficult . . ., fibromyalgia presents a conundrum for insurers and courts evaluating disability claims.'") (*quoting Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1067 (9th Cir. 1999)).

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n. 3 (6th Cir. 2007); *see also Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 817-18 (6th Cir. 1988); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 915 (3rd Cir. 2003). Therefore, objective medical evidence by a treating physician that corroborates allegations of pain is likely to be minimal.

The ALJ noted in his decision that Dr. Cremer has treated Davisson for fibromyalgia since 2003. (Tr. 17.) The ALJ also noted that Davisson's polyarthropathy had been escalating since 2007, when her course of conservative treatment began to be ineffective. *Id.* Further, it was noted that in July of 2008, Davisson had seventeen out of eighteen tender points for

fibromyalgia, and in October 2008, she had sixteen tender points. (Tr. 18.) These types of notations are found consistently throughout Davisson's medical records and reflect the only corroboration typically available in fibromyalgia cases. The nature of fibromyalgia and consistency of the findings in Davisson's records are a sufficient basis for Dr. Cremer's opinions.

Davisson further contends that the ALJ erred by rejecting Dr. Cremer's opinion insofar as it is contradicted by her activities of daily living. Davisson testified that her daily activities were limited due to pain, but she also testified that she is still able to cook, shop, drive, perform household chores, use a laptop computer, and watch television. (Tr. 17, 31-33.) However, she explained that she was only able to perform chores for fifteen minutes and then must rest for thirty to forty-five minutes or sometimes an hour. (Tr. 31-33.) She further testified she scheduled her shopping trips at times when others could help her. (Tr. 31-33.) Contrary to the ALJ's findings, these activities do not contradict Dr. Cremer's opinion. Dr. Cremer noted that Davisson could only sit for two hours in an eight-hour day and would be able to stand or walk during the workday for no more than an hour. (Tr. 17.) Davisson testified that she spends four to five hours a day in bed, and sometimes stays in bed all day due to pain. (Tr. 35.) This suggests limitations in the amount of time she may be able to sit or stand in a work environment. Thus, Davisson's testimony is consistent with Dr. Cremer's opinion. *See Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967) ("[t]he fact that [a claimant] can still perform simple functions, such as driving, grocery shopping, dish washing and floor sweeping, does not necessarily indicate that this [claimant] possesses an ability to engage in substantial gainful activity. Such activity is intermittent and not continuous, and is done in spite of the pain suffered by

[claimant].")

Lastly, Davisson claims that the ALJ erred in rejecting Dr. Cremer's opinion to the extent that it characterized Davisson's pain as "stable." "A person can have a condition that is both "stable" and disabling at the same time." *See Hopkins v. Comm'r of Soc. Sec.*, No. 1:07-cv-964, 2009 WL 1360222, at *1, *17 (S.D. Ohio, May 14, 2009) (*citing Hemminger v. Astrue*, 590 F.Supp.2d 1073, 139 (W.D. Wis. 2008)). Dr. Cremer did state that Davisson's pain had "stabilized," but also explained that it failed to significantly improve over time. (Tr. 740.) As such, Dr. Cremer's characterization of Davisson's condition as "stable" does not undermine his assigned limitations, as her pain may have stabilized at a disabling level.

As the ALJ rejected the treating physician opinions without sufficient explanation, Davisson's first assignment of error is well-taken.

**Credibility Findings**

Davisson claims that the ALJ failed to properly evaluate her credibility. She takes issue with the ALJ's conclusion that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible and were inconsistent with the RFC. (Doc. No. 12 at 21-22.) The Commissioner asserts that the ALJ's findings were consistent, that he provided a thorough analysis of the relevant factors and evidence based on the entire case record, and that he provided specific reasons supported by substantial evidence. (Doc. No. 15 at 9.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability. *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. First,

19

the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms."  SSR 96-7p.  Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

The ALJ accepted that Davisson suffered from various severe impairments, including fibromyalgia.  (Tr. 14.)  He found that the "impairments and their symptoms significantly limit the claimant's ability to perform the demands of basic work activities," and "the determinable impairments could reasonably be expected to cause the alleged symptoms."  (Tr. 14, 17.)  However, the ALJ dismissed Davisson's statements concerning the intensity, persistence and limiting effects of the symptoms as not credible.  (Tr. 17.)  Davisson contends that the ALJ failed to offer a single tangible reason as to why he found her statements not credible.

It is difficult to find corroborative medical evidence in fibromyalgia cases.  Thus, objective medical evidence corroborating allegations of pain will most likely be minimal, or even non-existent, resulting in a greater emphasis on the credibility of Davisson's subjective allegations of the severity.  Here, the ALJ found that Davisson's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with his RFC assessment.  (Tr. 17.)  The ALJ's credibility findings are entitled

to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96-7p, Purpose section; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").  Beyond medical evidence, there are seven factors that the ALJ should consider.[4]  The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

The decision lacks any discussion concerning the credibility of Davisson's pain stemming from fibromyalgia.  This is particularly troubling as the credibility determination in fibromyalgia cases is of "paramount importance" because its symptoms are entirely subjective.  *See, e.g., Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 960 (N.D. Ohio 2003).  The ALJ appears only to have taken one of the seven factors, Davisson's daily activities, into consideration when assessing her credibility.  The ALJ noted the following:

---

[4]     The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p, Introduction; *see also Cross v. Comm'r of Soc. Sec.*, 375 F. Supp. 2d 724, 732 (N.D. Ohio 2005).

21

> Although she indicated that she requires some assistance, she testified that she can perform some household chores (claimant hearing testimony; Exhibits 7E, 15F). She also cooks, shops, drives, watches television, and uses the computer (claimant hearing testimony; Exhibits 7E, 15F).

(Tr. 17-18.)

The ALJ's brief recitation of Davisson's "daily" activities is misleading. In fact, the ALJ neglected to explain how Davisson's occasional and infrequent activities performed for a limited amount of time undermine her allegations of disabling pain, how her medications alleviate or fail to alleviate her pain, what other treatments were used, if any, or what other factors concerning her functional limitations and restrictions were relevant. "[A court] cannot uphold a decision by an administrative agency … if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). Because the ALJ did not provide an analysis that is sufficiently specific, Davisson's argument that the ALJ failed to properly articulate a basis for his credibility finding is well-taken. The Court is unable to trace the path of the ALJ's reasoning. Though the ALJ certainly was not bound to find Davisson's allegations credible, the underlying analysis was insufficient under the Administration's procedural rules.

As the ALJ failed to properly conduct the credibility analysis, Davisson's second assignment of error is also well-taken.

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner failed to follow the Social Security Administration's procedures. Accordingly, the decision of the Commissioner is VACATED and the case is REMANDED for further proceedings consistent

with this opinion.

     IT IS SO ORDERED.

                             /s/ Greg White
                             U.S. Magistrate Judge

Date: June 17, 2011